[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case is an appeal from the decision of the defendant Department through its "Fair Hearing Officer" denying the plaintiff the right to Title XIX payment for specific out-of-state medical services recommended by her in-state treating physician.
In 1982, Patricia Marchetti, was involved in a serious head-on collision causing numerous serious injuries, so severe that she has been found to be permanently and totally disabled, entitling her to Social Security disability payments as well as Title XIX medical payments. Her medical case is extremely complicated because of the numerous anatomical and neurological areas affected. They run the gamut of traumatic brain injury, sternum injuries, loss of sight, loss of hearing, immunological damage, lung damage, etc. To list all the injuries would require a duplication of her treating physician's report. Accordingly, a copy of that report is attached as Appendix A. The plaintiff has undergone complete evaluation at Yale Department of Medicine's ophthalmology, neurology, retina glaucoma, immunology, allergy, endocrinology, gynecology, pain management and cardiothoracic departments. Also, she has been seen at the University of Connecticut Health Facility as well as by numerous physicians of various specialties. Her problems have been severely compounded by her allergic reactions to medications which are necessary for her treatment. Her physician, Dr. Raxlen, who is recognized by the defendant as an expert allergist wants her to see Dr. William Rea in Dallas, Texas, because "he has the equipment to measure certain chemical responses, and the non-phenol antigens, for desensitization. Essentially, Dr. Raxlen seeks the assistance of Dr. Rea so that he can determine what medications can be administered to the CT Page 7463 plaintiff which would not cause her condition to deteriorate. Many medications are enclosed in preservatives because without them they would deteriorate too quickly for commercial distribution. Testing is necessary with medicine that is not so preserved (non-phenol antigens) in order to determine if it is the medicine or the preservative which has been causing the extreme allergic reactions. According to Dr. Raxlen, Dr. Rea has the equipment and access to non-phenol antigens (unpreserved medicine) to do such testing and it is not available in Connecticut.
The plaintiff, who is seeking to avoid her continuation on Social Security, has been taking courses which will enable her to be employed if she can reduce her problem with medications. Accordingly, prior the Fair Hearing held on May 3, 1990, she sought two things. First, she sought to have the medical services that her physician thought necessary at the place he thought necessary, Texas, and in accordance with medical regulations applicable to out-of-state medical services. Second, she sought assistance in paying unpaid medical bills of nearly $60,000.00 which she had been trying to pay from her limited Social Security payments.
On March 21, 1990 her request for the out-of-state medical payments under medicaid was denied by the defendant department's medical doctor because she claimed that such services are available in Connecticut. On April 26, 1990, the out-of-state medical services were denied for the additional reason that "the department will not pay for any procedures or services of an unproved, experimental or research nature for services in excess of those deemed medically necessary by the department to treat the patient's condition."
The plaintiff requested a fair hearing before the department on April 3, 1990. On May 3, 1990, the department's hearing officer heard the case and on August 7, 1990 rendered a decision. As to the unpaid bills totaling $60,000.00, the hearing officer stated that he was at a loss for an explanation as to why the medical bills have not been paid and he suggested that the parties sit down to determine what would be the best procedure to arrange the payment of those expenses.
As to the issue of whether or not the medical treatment or testing recommended by the treating doctor is available in Connecticut, the hearing officer found that it was not. He held that greater weight must be given to the opinion and conclusion of the treating physician over the opinion of the department's physician, who never examined the plaintiff. He noted that Dr. Raxlen, the treating physician, is one of the allergists the department's physician recommended for the medical services CT Page 7464 needed by the plaintiff. On the issue of whether or not the treatment sought by the plaintiff is experimental in nature, the hearing officer held against the plaintiff and for the department.
From that decision relating to the issue of experimental treatment, the plaintiff has appealed. The defendant department has not appealed the rulings against it.
What is the basis of the hearing officer's decision on that issue? The department submitted some medical society articles that stated that approximately 500 medical doctors from different medical specialties practice "clinical ecology". The hearing officer found that the thesis of these articles is that "Clinical ecology is a form of medical practice based on two concepts: that a broad range of environmental chemicals in foods can be responsible for an illness in which an unlimited number of symptoms occur in the absence of objective physical findings, pathologic abnormalities, or specific abnormal results of laboratory tests; and that the immune system is functionally depressed by many environmental chemicals." He found from these articles that chemical ecology has not found wide support in the United States and the clinical ecologist's "diagnoses and treatments involved no proven efficiency." He also found that William Rea conducts, as part of his practice, clinical ecology. Based on that, the hearing officer found "that clinical ecology is not an accepted medical practice in the United States and, therefore, he found "that it is unproven and experimental in nature and not subject for payment by the Department of Income Maintenance."
Assuming that is true, the treating doctor, Dr. Raxlen, is not sending the patient to Doctor Rea for diagnosis, treatment or clinical ecology, but for testing. In fact, the department does not disagree with Dr. Raxlen's diagnosis. However Dr. Rea deviates from majority medicine in certain experimentation, if any, in terms of diagnosis, he is not being asked to diagnose in this case. He is being asked to perform a specific procedure because he has the equipment to do it and he is being asked to do it by the treating physician who the department agrees is an expert in that field. The court, therefore, examined the entire record to determine what evidence there was that the specific medical procedure that Dr. Raxlen wished Dr. Rea to perform was experimental. Finding none, the court asked the Attorney General's office to examined the lengthy record to see if there was any evidence the court had missed. The court gave that office two weeks to scour the record for any evidence to support such a position. The Attorney General's office acknowledged that there was no express evidence that the procedure the plaintiff was being sent to Dr. Rea for was experimental. They CT Page 7465 claim that if the procedure was not available in Connecticut, it must be experimental. The court rejects that bootstrap argument.
The court finds that the decision rendered here without evidence to support it is clearly arbitrary. The issue is then raised at to what the court may do in that event. The defendant argues that where a trial court has found that an administrative agency has made invalid or insufficient findings, the court must remand the matter to the agency for further precedings. It cites Persilo v. Maher, 191 Conn. 404, 409, 410 (1983). In that case, however, there was no medical or dental testimony presented at the hearing in support of the medical necessity for the requested treatment. In our case, the record is quite clear that the treating physician, Dr. Raxlen, accorded great weight by the hearing officer, opined the medical necessity of the procedures to be conducted by Dr. Rex to gather data necessary for Dr. Raxlen to treat his patient. In Weaver v. Reagon,880 F.2d 194 (8th Cir. 1989), a decision in which Judge Timber's from the 2nd Circuit participated and in which the state's claim was that the drug AZT was experimental in treating AIDS patients, the court held that the medicaid statute and regulations create a presumption in favor of the medical judgment of the attending physician in determining the medical necessity of treatment. The court held, further, that the state could not deny coverage of AZT to AIDS patients who are eligible for medicaid where treating physicians certified that AZT was medically necessary.
Accordingly, the decision of the department is reversed and the case remanded to the department to provide for such out-of-state medical services as requested by the treating physician in accordance with medicaid procedures and regulations for out-of-state treatment.
BARALL, J.
APPENDIX A
 BERNARD D. RAXLEN M.D. Biological Psychiatry Nutritional Medicine Environmental Allergy CT Page 7466 33 Soundview Lane New Canaan, Conn. 06840 Telephone (203) 966-6557
January 15, 1990 Dr. Patricia Smith Medical Director Dept. Income Maintenance 110 Bartholomew Ave. Re: Patricia Marchetti Hartford, Ct. Case No. 7439850 old New Case No. 1252659
Dear Dr. Smith:
Per your request, I am writing this letter to give you information on my patient, Patricia Marchetti. Her case is extremely complicated because of the numerous anatomical and neurological areas affected. My report will be broken down into each anatomical area involved. The damage to her immune system is so severe that it has caused sight and hearing loss, malabsorption of food, pain problems, endocrinological abnormalities and special intricate blood analyses were needed to identify these rare abnormalities in her blood. In my initial evaluation of April, 1988, Patricia showed extremely allergic symptoms to a wide range of common environmental substances as well as food. Exposure to smoke, perfume, cleaning products, ink pens and printing materials, mold, dust, carpet treatment chemicals, exhaust fumes, and certain soaps, shampoos, deodorants, even toothpaste and dental materials, produces serious impairment of breathing and sight loss with possible life threatening asthma attacks. Chronic pain from mild to severe along with spasms in the muscular structure of the legs, chest, back, arms and face is also added to the allergic reactions. The pain complicates walking any distances more than several yards. A wheelchair has helped when further distances are desired. When in a sitting position for a period of 15 minutes both legs, from pelvic area to feet turn blue, and the lateral areas of the legs and posterior buttocks burn. Some clothing material produce these same symptoms.
Pat had already undergone complete evaluation at Yale Department of Medicine in Ophthalmology and Neuro-Ophthalmology, Neurology, Retina, Glaucoma, Immunology, Allergy, Endocrinology, Gynecology, Pain Management and Cardiothoracic Departments; also, specialized Neuro-physical Therapy in West Hartford, reported diagnoses and signs of traumatic brain injury as well as total body muscle and bone abnormalities, all appearing secondary to automobile trauma. Enclosed are all previous physicians' names and departments and their diagnoses that were seen in the State of Conn.
Pat was involved in a head-on automobile collision in 1982 and the sustained injuries were bruises, abrasions, selling of the frontal lobe and nasal areas. Cervical vertebraes 2, 3, and 4 were resected and CT Page 7467 clamped back into position. Tissue clamps along the left jugular as tracheal cartilages had been shifted. The top of the steering wheel pushed the mandible bone posteriorly as her head went into the windshield. The lower part of the steering wheel struck midline to the left anterior of the chest causing sternum and costral condral separation, bilaterally. She also had hairline fractures of the left hand base metacarpal bones, 2, 3, and 4 with abrasions and bruises in the palmar aponeurosis and adductor pollicis muscles which was operated on in 1987 because of numbness due to lack of circulation in the hand. Rib fractures were bilaterally 2, 3 and 4. First ribs bilaterally were removed. Upon cracking, the steering wheel then dropped down into the lower left quadrant of the pelvic area severely bruising but showing only hairline fracturing of the symphysis pubis inguinal sulcus and the greater trochanter. Numerous surgeries were performed on the scalene muscle, brachial plexus area on the left side. She was plagued by severe headaches, tinnitus of the ears, and left side hearing loss was documented at that time. She had severe allergic life threatening asthma attacks dermatological problems to the point of bleeding, vaginal yeast infections, and chronic pain with muscle spasms in the neck, face, chest, back, and legs with loss of circulation evident in the lower extremities which turned blue when sitting for any more than fifteen minutes. Walking was also restricted to 25 to 50 yards. A wheelchair had to be used for any further distances. Malabsorption of foods was documented in a comprehensive digestive enzyme study.
1982 — 1988:
Eyes: Pat has had increased sight loss since the accident to the point where she has difficulty seeing at night, double vision, increased edema behind the eyes, pupils constricted, and dilated bilaterally paradoxally to each other when around perfume or any scented soaps, and shampoos. Also swelling of the upper and lower eyelids were evident. Bulbar conjunctive of both eyes would get bright deep blood red and burn when wearing her eyeglasses of plastic lenses and frames. In 1986 she was seen by Dr. Peter G. Burch, M.D., Ophthalmologist, in Wallingford, CT, who was unable to diagnose and treat the visual loss problems and referred her to the Yale Department of Ophthalmology and Yale Department of Allergy. The Yale Department of Ophthalmology documented lattice holes, degeneration and retinal deterioration and further reported: "In the right eye there is lattice degeneration between 10 and 2 o/c without holes, and several erosions near the ora serrata. There is lattice with a separate hole and localized retinal elevation containing a demarcation line at 4:30 o/c at the equator, and a separate area of lattice with holes, with surrounding retinal elevation and demarcation line measuring less than one disc diameter at 5:30 o/c at the equator. There are areas of white with pressure and patches of lattice between 7 and 10 o/c. The left peripheral retina shows lattice in areas of white with pressure between 10:30 and 12 along the equator, and scattered erosions anteriorly. Patches of lattice between 4 and 7 o/c are also prominent and there is a hole in lattice at 6 o/c." CT Page 7468
Octopus fields done at Yale revealed some nasal loss in the left and right eyes and a question of an articulate defect in the right eye. In 1986-87 she was referred to the Retinal Study Center at Yale, and a retinal photo diagram showing retinal detachment plug floaters was observed. Still not resolving her continued sight loss, the Retinal Center referred her to Yale Center for Clinical Research Glaucoma Service. They stated that "the dilated fundus revealed peripheral lattice with holes and it was determined that this patient does not have glaucoma and her decreased visual acuity is not explained by her ophthalmic exam."
In 1987-88, she was referred to the Neuro-Ophthalmology Cataract Lens Implant Surgery Department which also documented decreasing sight with further deterioration but again no current research at Yale or treatment available on why or how to stop progression of the sight loss. She then was referred to Yale Department of Disease of Retina and Laser Surgery. This department also documented further visual decrease and peripheral loss and that a possible allergic response could be causing visual loss. However, this department also could not treat her. She then was referred to the Yale Department of Allergy, Immunology, Endocrinology, Obstetrics, Gynecology, Cardiothoracic, and Neurology, departments for further testing. Numerous blood tests that were taken were not sophisticated enough to encompass her complicated immunological system dysfunctions and she did not tolerate at all the medications that were prescribed on a trial basis. She had more symptomology after taking all medications which only exacerbated her already severe problems. The above mentioned departments all agreed that she did have immunological, endocrinological problems and possibly allergy related vision problems, food intolerances, dermatological, severe chronic pain, muscular atrophy and neurological problems and a severe vaginal yeast infection that did not respond to any treatment. All of these departments felt that they did not know how to treat this patient's condition and her problems. She was then referred to Yale Center for Pain Management and Anesthesiology Department with the hope that they could reduce her pain problems. After many anti-inflammatory medications were prescribed and no results obtained, they advised a trial of epidural duramoph. Modest improvement was noted but severe nausea and headaches were documented after dosages of .6 mg and .8 mg of duramoph epidurally. The doctors mutually agreed that the adverse side effects of the epidural duramoph outweighed any relief and so it was discontinued.
In 1987 Pat was seen by Marshall Mandell, M.D. DABP, DABAI, FACA, FSCE. He concurred in the diagnoses of Yeast infection, Multiple Allergic Syndrome, Vasculitis, and Chemical Hypersensitivity. However, after numerous trials of medications and allergy treatments he also found the dose levels to be more than the immune system could handle. Pat was also seen by two pain management groups: Dr. Jeffrey Zimmerman in Bloomfield, and his associate in New Haven, Ct. Their diagnoses of this patient's problems were not emotional, but physically caused. They also felt that Pat was using every technique they already knew to control the pain. They had no CT Page 7469 further help other than support.
She was then referred to Dr. William Padula, O.D., F.A.A.O., and his partner, Dr. Dana Shepherd on July 1, 1988. Dr. William V. Padula serves as Director of the Low Vision Clinic at the Rehabilitation Center in New Britain. (For other credentials, see attached sheet.) Upon examination, Dr. Padula diagnosed post traumatic vision syndrome due to the closed head injuries sustained in 1982. A battery of intricate blood analysis by Monroe Medical Research Laboratories showed extremely high histamine levels, numerous blood abnormalities, a very unstable immune system response when exposed to environmental antigens which has created a very volatile situation that significantly affects her vision. Dr. Padula found in his examination that after the patient's exposure to smoke and perfume, her pupils dilated and constricted paradoxally with severe vascular swelling occluding the optic nerve. Pat's best corrected acuity was now 20/70 o.d., 20/30 o.s. and 20/300 o.u. and still reported double vision. Her distance refraction was variable with an increase in myopia in the right eye and variation in the astigmatism in the left. Eye health examination found the pupils to be responsive to direct and indirect light stimulations. The fundi now had unequal cupping of the eyes. Her jerky eye movements and difficulty with converging her eyes to fixate on an object moved toward her were still observed. Exposure to gas, fumes, exhaust smoke, scented or cleaning products, even pen ink, resulted in total visual loss. Dr. Padula's findings believe that the fluctuations and sight loss that Pat is experiencing in her vision are directly related to environmental antigens. Her immune system cannot adequately adjust to the stresses evoked by these antigens. A new distance prescription and higher powered near-vision prescription were recommended. A spectacle mounted bioptic telescope was also recommended to enable Pat to more easily spot objects at a distance. Corning lenses were also recommended to reduce the pupil response to direct and indirect light. When Pat used the new metal frames and glass lens prescribed, Pat's eyes decreased in burning sensation, and the blood red area of the bulbar conjunctiva was reduced. Upper and lower eyelid swelling also diminished. However, when exposed to various environmental antigens, the eyelids immediately swelled up again, also the major arteries, veins surrounding the eyes, and central retinal vessels which occluded the optic nerve. Visual sight and hearing loss were documented, Pat's prescriptions for lenses had to be changed six times from August 1988 to October 1989. Pat is now diagnosed legally blind. Dr. Padula's updated report is being sent to you.
Teeth: Among Pat's problems are the replacement of defected, amalgam restorations which were found to have mercury toxicity and electrical stimulus. She is hypersensitive to plastics, dental amalgams, dycal, and composite bonding agent scotchbond, and Dr. Hinchey is still trying to find dental materials that will not cause her to have a severe allergic reaction. Because of possible allergic reactions, temporary fillings had to replace the initial amalgam fillings. Even temporary fillings cause severe allergic responses in the gums, teeth and vision area. Presently, there still remains some electrical stimulus even on temporary fillings. CT Page 7470 Dr. Hinchey feels that pure porcelain and gold replacements might possibly be the materials that she could tolerate. Pat's #8 tooth has a cap and this also had to be replaced because of the electrical reading. A pure porcelain crown was ordered for replacing this #8 tooth cap. Because of peridontitis, severe pain, and diagnosed root fracture, #15 tooth was removed. This extraction was done without any injected or local anesthetic provided due to the patient's high allergic response to any anesthetic. The following teeth still have electrical readings: #2 tooth has -1.8 IRM, #3 tooth has -1.4 IRM, #4 tooth has -2.2 IRM, #8 tooth has -0.1 Acrylic Gold, #12 tooth has -1.0 IRM, #13 tooth has -0.8 IRM, and #19 tooth has -0.5 IRM. The initial start of the procedure was May 1989 and as of this date, has still not been completed due to allergic responses to dental materials. Prior to and during all the dental procedures the patient's oral temperature has varied from 96.5 up to and including 104.8 degrees, temperatures which have been documentated and still remain varied at the present time. Both zipper and lower gum areas have peridontitis with infection into the sinus area. Pat also responded severely to liquid Peridex irrigations of the gums. She also cannot tolerate injectable or tablet antibiotics. Whenever any dental procedure is done, lactation of both breasts is noted. Sterile cotton gauze was used between the patient's face and the rubber dam due to the allergic response to rubber. Distilled water was used for irrigation as additives in the city water also cause severe allergic responses. Dr. Hinchy will send you an update on his progress.
Lungs: Due to the severity of the trauma and surgeries resulting from the automobile accident, there are large amounts of scar tissue and muscle that have been removed both anteriorly and posteriorly in the bracheal plexus, bilaterally, sternum, and cervical area. Because of Pat's allergic environmental reactions, I prescribed oxygen with tygon tubing and nasal cannula at 3 liters during the day and 2 liters at bedtime. She also uses a 100 percent cotton mask especially formulated with charcoal and coconut shell filter. Pat's major complaints are that lungs burn constantly, and that she has extreme difficulty inhaling after exposure to chemicals. Blood has been noted in sputum and nasal passages after exposure. Pat's housing is totally inadequate. Gas heat and mold from the basement comes in through the ventilation system, along with the cat hair, smoke, hair spray, aerosol deodorants, laundry products, and any cleaning product fumes from the upstairs and downstairs apartments which filters into Pat's apartment causing severe allergic life threatening asthma attacks and sight loss. In July of 1988, I wrote a letter to her caseworker (Mrs. Tyson) at the time, requesting that Pat be removed from her apartment and that she obtain medical equipment such as filtration systems that remove dust, smoke, formaldehyde, and pollen from the air. These were denied. I have also written to all of the housing authorities Pat has applied to, but to no avail. She has been unable to find adequate housing within the special guidelines of her illness and financial income. Pat's present landlord has the terminex people spray once a month and in Sept. 1989, started painting all areas inside and outside the apartment house. This increased the bleeding, swelling in her lungs, CT Page 7471 throat and nasal passages, not to mention the life threatening asthma attacks.
Kidneys and Intestines: Pat's sensitivities are so extreme that she has allergic reactions to micro doses of medications that contain dyes, preservatives, additives, milk products, corn products, sugar, soy, yeast, and even the plastic capsule that contain pure natural ingredients. This causes anuria, presence of blood in urine, boil-like rashes, intestinal bloating, and constipation, along with swelling of the bronchial areas. Malabsorption of food problems also exists. Great Smokey Mountain Laboratories have documented the evidence of large amounts of undigested whole food in fecal matter. There are a large variety of foods that can cause Pat's allergic responses, even in one-eighth teaspoon amounts, and the end results are immediate diarrhea five (5) minutes after ingesting food, compounded by rashes and anaphylaxis. Documentation of extremely low amylase, pepsin, trypsin, lipase, and pancreatic juices were noted in laboratory testing along with a large number of blood abnormalities.
Vaginal area: In 1985, Pat was diagnosed with a severe vaginal yeast infection. Numerous vaginal creams, suppositories, oral medications and douches were prescribed, but none of these subsided the infection at all. It was documented that some grains such as wheat, rye, corn, and fruit increased the severity of the condition and when these were eliminated from her diet along with peroxide and distilled water douches, the condition improved, but has not been completely cured.
Skin and Hair: Pat is severely allergic to bath, laundry soaps, shampoos, hair sprays, creams, deodorants, powders, oils, make-up of any kind (with the exception of pure coconut oil), toothpaste, all clothing and towels that are not 100 percent cotton, even bed sheets, pillows, and blankets. Boils with bubbly encrusted exteriors that have clear liquid and hard white centers appear. When her skin has come in contact with one of these substances it starts to burn, then peeling to the point that bleeding will occur. This has been noted all over her body from scalp to toe. Prior to amalgam removal, her hair was dry, brittle and would come out in clumps. After the initial amalgam removal started, her hair grew and became shiny with luster. When Pat is exposed to smoke, perfume, and cleaning chemicals, she not only has sight loss and breathing problems, but her body also produces large, white filled pustules. These pustules must be lanced and irrigated with distilled water and peroxide as this is the only effective treatment at the present time to clear up the inflammation. When reacting to food intolerances, she breaks out with raised welted rashes, and bright red swollen blotches all over her body. The patient is also allergic to gas sterilized needles, and noted in the injection site area was a large red welt of 2" in diameter after the syringe vial was emptied. The patient's friend also documented that the patient's skin color changed from a cream/brown tone to green in the face, hands, legs, back, and feet after exposure to polyurethane. We have no explanation for this change. CT Page 7472
Face, Chest, Hands, Arms, Legs, and Feet: In March of 1987, an evaluation and treatment was done by Regional Physical Therapy, P.C., and treatment is continuing at the present time. Pat sustained severe neuromuscular skeletal dysfunction from multiple traumatic brain injuries along with severe postural deviations and has a problem of mobility and flexibility in all areas of the trunk and extremities. There was defuse protected muscle spasms and atrophy throughout all musculature of her body. The evaluation done by Regional Physical Therapy documented muscular skeletal dysfunction, postural asymmetry in the left pelvic girdle and the left shoulder girdle compared to the right. The pelvic obliquity was the result of biomechanical dysfunction of the lumbarsacral spine. Protective spasms in the face, left maxillofacial and left, ear caused acute pain bilaterally, and TMJ pain of the face, neck, upper back, shoulder girdles, lower back and left groin. There is burning in the chest, left upper extremity, buttocks, and lower extremities. Pat's hips are very unstable due to the weakness of the pelvis and lower extremities. You are able to see and hear her hips "pop" about in the sockets. She drags her left lower extremity when she walks due to lumbopelvic biomechanically dysfunction. She does better temporarily after treatment, but unfortunately it cannot be maintained due to muscle weakness. There is atrophy throughout the total body's muscular structure and it is most noted in the hip flexors and hip abductors, lower ribs and lower midback. Protected muscle spasms are also noted in the diaphragm muscle. There is much spasm in the facial muscle and noted temporomandibular joint dysfunction. The pelvis is grossly shifted to the left with the left ilium higher than the right. There is a genu varus deformity of the right lower extremity, and the thoracic spine was shifted to the right scapular higher than the left. Forward bending of the lumbar spine is limited to 75% of full range of motion. There is 65% lateral flexion of the lumbar spine. Progression was extremely slow with her treatment because of the reactions she sustained with her therapy. She still suffers significant pain. She is weak although she tries to do exercise to increase her strength and endurance. Weather changes, increase or decrease in barometric pressure, hot or cold weather, and rain causes an increase of the already severe pain spasms throughout the total face, trunk, and extremities. On December 28, 1989, a functional Neuro-Muscular Re-Education evaluation was done by Theresa Wilson; her diagnosis: Cervical Syndrome, pain and dysfunction in the following areas: Arms, knee, thoracic, lumbar, pelvic, ankle/foot and also noted was hemiplegia. Regional Physical Therapy will send you this updated report.
Ears: In December (14 21): 1988, Pat went to the Audiology Dept. at the University of Connecticut Health Center, where Dr. Marjorie Jung, M.S. CCC-A. diagnosed a moderately mixed hearing loss in both left and right ears, with a nerve hearing loss of moderate degree in the right side. She recommended that the patient would benefit from a hearing amplification aid.
On January 30, 1989, Pat saw Gerald Leonard, M.D. and Robert Yellon, M.D. of the Otolaryngology Department at the University of Connecticut Health CT Page 7473 Center. Their diagnosis was noted to have minimal nystagmus of the eyes on looking up or down. Their impression was that the patient had a form of Meniere's disease or endolymphatic hydrops. They recommended that the patient be evaluated by an allergist as this is a progressive disease and in spite of the patient's history of severe, multiple allergies related edema that treatment may be possible.
On June 7, 1989, Pat was referred by Dr. Jacqueline Germain to Dr. Harold Trinkoff (Neurology) at Memorial Hospital in Meriden, CT. His diagnosis stated that after a radiological MRI was done by Dr. D.B. Crawford at the University of Connecticut Health Center on June 13, 1989, both doctors could not completely rule out Multiple Sclerosis, as their results showed minute evidences of this disease.
Dr. Smith, by reading the last six pages of this report, you may now understand that my patient's problems are not of a simple nature by any means. I have enclosed a list of all the physicians who have been involved directly (through referral) or indirectly (by phone consultation) assisting me with the treatment of Patricia's conditions. Trying to establish a proper treatment protocol was not an easy matter. First, I had to identify and diagnose each of the symptoms, organs that were affected separately and then incorporate (collectively) each area of dysfunction and how the "whole picture" came together, and apply a treatment regime. Testing of blood analyses included food allergy (which affects digestion and absorption), inhalant allergy (trees, mold, chemical), along with chemical related exposure that is causing edema, damaging the areas of the lungs, ophthalmic and otolaryngologic areas. In the Rast/Immuno testing along with the analyses and diagnoses of all the participating physicians in each specialized field, we all felt that in this case, because of the severity of Patricia's problems, she needs qualified trained physicians in each specialized area (who can treat her rare condition) who will all work together in their combined treatments. I have not been able to find physicians who are qualified to help me treat the allergic reactions that Pat has which cause extreme dysfunction to her hormonal, vascular (eyes, hearing, and muscular), digestion, etc. Each physician Pat has seen is well qualified in their respective fields; however, the allergic responses that Pat has to so many micro-dose levels of pure/natural medications, and that she reacts paradoxically along with the environment only complicates each of our treatment protocols we would normally prescribe. I strongly recommend that Pat immediately find better living quarters with a separate entrance and exit, and with no gas heat; and that she see Dr. William Rea in Dallas, Texas. He has the knowledge as well as the equipment to measure the chemical responses, and no-phenol antigens, for desensitization.
Very truly yours,
Bernard Raxlen, M.D.